# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | CRIMINAL NO. JKB-07-0331 |
| SCOTT L. RENDELMAN, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Defendant Scott Rendelman was convicted in 2008 of mailing threatening communications under 18 U.S.C. § 876(c). (ECF No. 165-1 at 2.) The sole contested issue left for the jury to decide was whether the letters Rendelman sent constituted "threats." (ECF No. 68 at 39.) Following then-applicable law, the trial judge instructed the jury that a communication was a threat if a "reasonable person" would believe it to be so. (ECF No. 165-1 at 4.) The jury did not have to find that Rendelman subjectively believed that his communications could be viewed as threatening violence. Because Rendelman's subjective intent was irrelevant, the trial court also precluded Rendelman from testifying or presenting evidence about his subjective understanding of the communications he sent. (ECF Nos. 76 at 37; 77 at 24–26; 67 at 42.) The jury returned a guilty verdict. (ECF No. 165-1 at 4.)

In 2023, the Supreme Court held in *Counterman v. Colorado* that the First Amendment "requires proof that the defendant had some subjective understanding of the threatening nature of his statements" and that "a mental state of recklessness is sufficient." 600 U.S. 66, 69 (2023). Rendelman timely sought authorization from the Fourth Circuit to file a successive motion to vacate his convictions under 28 U.S.C. § 2255. The Fourth Circuit found that Rendelman had

made a *prima facie* case that *Counterman* announced a new rule of constitutional law that was retroactively applicable on collateral review, so it authorized Rendelman to file a successive motion to vacate his convictions in this Court. (ECF No. 165-1 at 9.) Rendelman now contends that, under *Counterman*, the trial court erroneously instructed the jury and wrongly precluded his defense. Rendelman asserts that these errors were not harmless. The Court agrees, so it will grant Rendelman's Motion to Vacate Convictions (ECF No. 166) and order a new trial.

## I.    FACTUAL BACKGROUND

The relevant facts underpinning this case reach back nearly forty years. In 1986, Rendelman began serving a short prison sentence for embezzlement from his former employer. (ECF Nos. 104 at 7; 60 at 9.) Less than two months into his sentence, he contends he was raped by his cellmate. (ECF No. 104 at 8.) Rendelman reports that the attack had a profound effect on him. (*Id.*) Soon after the alleged attack, he wrote letters to his former employer and the judges and prosecutor in his embezzlement case, in which he threatened to kill them. (*Id.*) Rendelman was sentenced to an additional five years in prison. (ECF No. 60 at 9.) He says that he was then raped several more times; his letters continued. (ECF No. 104 at 8.) Throughout the 1990s, Rendelman continued to accrue convictions for writing threatening letters. (ECF No. 60 at 10.)

Rendelman explains that he began writing his letters as a form of protest. (ECF No. 104 at 10.) He claims awareness that if he merely stopped writing letters, he could get out of prison. (*Id.*) But he says that if he stopped writing his letters, that would indicate to the government that its "correctional programming, which included the brutal rapes . . . achieved the government's goal of rehabilitating [Rendelman] to a crime free life." (*Id.*) And this was something Rendelman "swore to himself that he would not allow." (*Id.*)

Eventually, in 2001, Rendelman was released from prison. (ECF No. 165-1 at 3.) He then

served three years on supervised release without incident. (ECF No. 104 at 22.) He also did not write any threatening letters during these three years. (*Id.*) But the day after his supervised release ended (meaning he had no restrictions on whom he could contact), Rendelman sent a letter to the former employer from whom he had embezzled. (*Id.* at 23.) This letter was different from the others in that it did not threaten violence. *State v. Rendelman*, 404 Md. 500, 505–07 (Md. 2008). Rather, Rendelman threatened only to sue the employer for money Rendelman felt he was owed. *Id.* Nevertheless, Rendelman was charged in Maryland state court with extortion. *Id.* at 508. He was convicted and sentenced to prison. *Id.*; (ECF No. 104 at 25.) However, his conviction was reversed on appeal because the Court of Appeals of Maryland (now, the Supreme Court of Maryland) found that a threat to take legal action against someone could not constitute extortion. *Rendelman*, 404 Md. at 503.

Before Rendelman's extortion conviction was reversed, he wrote the letters that give rise to this case. (ECF No. 104 at 26.) These letters seemed to threaten violence against several people involved in the extortion case: the state court trial judge, the prosecutor, and the former employer who was the alleged victim of the extortion. (ECF No. 165-1 at 3.) Rendelman also sent letters to the President of the United States and to White House employees. (*Id.*) The letters contained highly graphic statements. For instance, Rendelman told the judge: "I will kill all your family members" and "[w]hen I am released, you will die." (ECF No. 181-4 at 1–2.) He also said he would commit sexual violence against the judge's corpse. (*Id.* at 2.) In a letter to the prosecutor, Rendelman used much of the same language. (ECF No. 181-6.) In another letter, he stated that he was going to "suicide bomb" the White House and "take as many government scumbags with me as I possibly can." (ECF No. 181-3.) The letters also contained other elements. For instance, several of them repeated the phrase "I'm rehabilitated" or similar messages at the end. (ECF Nos.

181-3; 181-4; 181-6; 181-8.)    Rendelman also launched many profane insults at the letter recipients. (*See, e.g.*, ECF Nos. 181-4 at 1; 181-5 at 1.)

Rendelman proceeded to trial on six counts, each alleging violation of 18 U.S.C. § 876(c), which prohibits the mailing of threatening communications. (ECF No. 165-1 at 3.) Rendelman represented himself with the assistance of standby counsel. (*Id.*) Rendelman's planned defense was to assert that the letters were protests, not true threats punishable by § 876(c). (*Id.* at 3–4; ECF No. 77 at 23–26.)    However, the trial judge, the Honorable Roger W. Titus, seemingly applying then good law, responded that Rendelman could not offer this defense. That was because "[i]t is not what is in Mr. Rendelman's mind that is relevant." (*Id.* at 26.)    Rather, all that was relevant was "what a reasonable person receiving [the] communication would believe it to be." (*Id.*) Judge Titus then said, "and that's how I intend to instruct the jury on the question." (*Id.*)

During opening statements, Rendelman sought to bring up psychological evaluations indicating he was nonviolent. (ECF No. 77 at 59.) He claimed that the recipients of his letters were aware of these reports. (*Id.* at 59–60.) He wanted to introduce them in the evidentiary phase to show that the letter recipients could not have interpreted his letters as true threats. (ECF No. 175 at 7.) However, the trial court did not allow Rendelman to discuss this topic. (ECF No. 77 at 60.) He instructed Rendelman to bring the issue up in the evidentiary phase but stated that it is "doubtful" that the evaluations were admissible. (*Id.*) Later in his statement, Rendelman briefly stated that he wrote the letters to show the recipients "how they were rehabilitating" him. (*Id.* at 65.) He then devoted a significant portion of his opening statement to discussing the reasonable person standard. (*Id.* at 65–67.)

During the evidentiary phase, the prosecution called some of the recipients of the letters as well as several law enforcement witnesses. After the prosecution rested, Rendelman moved for

4

judgment of acquittal. The trial court denied the motion based on its finding that a reasonable person could construe the letters as threats. (ECF No. 67 at 42.) Rendelman then stated that he planned to testify in his own defense. (*Id.*) However, the trial judge engaged in a lengthy colloquy, explaining the dangers associated with testifying. (*Id.* at 42–43.) After speaking with standby counsel, Rendelman elected not to testify or even to put on a defense. (*Id.* at 44–45.)

The trial judge then delivered the jury instructions. The judge gave the following instruction on how the jury could determine if a "threat" was made:

> A statement is a threat if it was made under such circumstances that a reasonable person hearing or reading the statement would understand it as a serious expression of intent to inflict injury. To determine whether or not the defendant made a threat, you should consider the circumstances under which the statement was made, including its context with respect to surrounding conversation, the language the defendant used, and the reaction of those who heard or read the statement.

(ECF No. 98 at 24.)

During closing arguments, both parties heavily emphasized the reasonable person standard. Rendelman told the jury that he conceded that he violated every element of § 876(c) except for actually making a threatening communication. (ECF No. 68 at 32–33.) Thus, as Rendelman noted, the only question for the jury was whether a reasonable person would view the letters as threats. (*Id.* at 33.)

The jury convicted Rendelman on all counts. (ECF No. 165-1 at 4.) The trial court sentenced him to fifteen years in prison to be followed by three years of supervised release.[1] (*Id.*) Rendelman's conviction was affirmed on appeal. *United States v. Rendelman*, 641 F.3d 36 (4th Cir. 2010).

---

[1] Rendelman has completed his prison term, but he has not yet served his term of supervised release because he is incarcerated pursuant to another conviction—one arising in the Southern District of Illinois. *United States v. Rendelman*, 495 F. App'x 727, 728 (7th Cir. 2012).

Post conviction, Rendelman has moved to vacate his instant conviction twice before. In 2013, this Court denied his first motion. (ECF No. 114.) In 2015, the Fourth Circuit denied authorization for a second or successive application. (ECF No. 125.)

In September 2023, Rendelman again sought authorization from the Fourth Circuit, *pro se*, to file a successive § 2255 motion. (ECF No. 165-2.) The Fourth Circuit appointed counsel for him. (ECF No. 165-1 at 6.) Rendelman argued that the Supreme Court's holding months earlier in *Counterman v. Colorado*, 600 U.S. 66 (2023) changed the landscape. He pointed out that under *Counterman*, to convict a defendant of making a threatening communication, the First Amendment requires that the government prove "that the defendant had some subjective understanding of the threatening nature of his statements." *Counterman*, 600 U.S. at 69. Rendelman argued that the trial court violated *Counterman* by not instructing the jury on this *mens rea* element and by precluding him from offering evidence and testimony going to his subjective *mens rea*. (ECF No. 165-2 at 6.) This time, Rendelman was successful. In authorizing Rendelman to file the instant application, the Fourth Circuit held that Rendelman had made a *prima facie* showing that he satisfied the strict gatekeeping requirements of 28 U.S.C. §§ 2244(b) and 2255(h). (ECF No. 165-1 at 9.) The court explained that Rendelman had made the required showing that *Counterman* (1) had established a new rule of constitutional law (2) that could be retroactively applied on collateral review and (3) was previously unavailable to Rendelman. (*Id.*) Rendelman then brought his Motion to Vacate Convictions (ECF No. 166) in this Court.

## II.    STANDARD OF REVIEW

Under 28 U.S.C. § 2255, a federal prisoner may move to vacate his sentence if "the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). While "[t]he scope of collateral attack under § 2255 is narrower than on appeal," a habeas

court may review "error[s] of constitutional magnitude." *United States v. Dixon*, No. ELH-10-0552, 2024 WL 415348, at \*3 (D. Md. Feb. 2, 2024). However, mere proof that an error occurred does not suffice to vacate a sentence. Rather, for non-structural errors, a petitioner must establish that the error had a "substantial and injurious effect" in determining the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *United States v. Smith*, 723 F.3d 510, 515–16 (4th Cir. 2013) (holding that the *Brecht* standard applies in § 2255 cases). To prevail on a § 2255 motion, "a defendant bears the burden of proving his grounds for collateral relief by a preponderance of the evidence." *Dixon*, 2024 WL 415348, at \*3.

When a petitioner brings a second or successive petition for post-conviction relief under § 2255, the standard is even more exacting. The applicant must have either (1) discovered new facts that could not have previously been discovered with due diligence or (2) "show[] that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. §§ 2244(b)(2), 2255(h). However, before bringing this claim in district court, the applicant must first seek authorization from "a panel of the appropriate court of appeals." *Id.* § 2255(h). If the panel finds that the petitioner has made a *prima facie* showing that he meets the strict requirements of §§ 2244 and 2255, then the applicant may bring his petition in district court. *Id.* § 2244(3)(C).

## III.   DISCUSSION

The Fourth Circuit authorized Rendelman to bring the instant Motion based on the new rule of constitutional law announced in *Counterman*. Rendelman argues that the trial court committed *Counterman* error in two ways. First, he alleges that the jury instructions were erroneous because they only required the jury to consider whether a reasonable person—not Rendelman himself—would have found his communications to be threatening. (ECF No. 175 at

20.) Second, he asserts that the trial court unconstitutionally prevented him from presenting a defense that was probative of his subjective intent. (*Id.* at 17.) Rendelman concludes that each of these errors in isolation, and certainly both of them together, were not harmless. (*Id.* at 20.)

The government admits that the jury instructions were erroneous. (ECF No. 181 at 15.) As to the preclusion of Rendelman's defense, the government makes two principal objections. First, it argues that the Fourth Circuit did not authorize Rendelman to make this claim (*id.* at 21), and second, it argues that, regardless, Rendelman has forfeited this argument because he did not raise it at trial (*id.* at 20). As explained further below, the government is incorrect on both counts. On the merits, the Court finds that the preclusion of Rendelman's defense amounts to constitutional error. Finally, the government contends that, even accepting that these two errors occurred (i.e., erroneous jury instructions *and* preclusion of his defense), *both* were harmless under the demanding *Brecht* standard. (*Id.* at 17, 22.) The Court again disagrees.

### A. Authorization for Successive Petition

Before reaching the merits of this dispute, the Court must confirm that it has jurisdiction over Rendelman's claims. 28 U.S.C. § 2244(b) requires Rendelman to seek authorization to bring his claims in this Court. Because "[t]his provision is jurisdictional," the Court cannot consider his claims without a pre-filing authorization. *Poole v. Nines,* No. JRR-22-2234, 2024 WL 3424079, at *2 (D. Md. July 15, 2024). Rendelman applied to the Fourth Circuit for authorization to bring this Motion and the Fourth Circuit granted his request. (ECF No. 165-1.) However, the government contends that Rendelman only received authorization to bring his jury instruction claim, not his preclusion-of-defense claim. (ECF No. 181 at 21.) In support of this argument, the government points to language in the Fourth Circuit's opinion which emphasized the instructional error when granting authorization. (*See, e.g.,* ECF No. 165-1 at 9.) Thus, in the government's

view, the Court cannot consider the preclusion-of-defense claim at all. (ECF No. 181 at 21.)

The government's argument cannot be squared with the caselaw. The Fourth Circuit has explained that, when authorizing successive habeas applications, it "examine[s] the application to determine whether it contains any claim that satisfies . . . § 2255 ¶ 8. If so, the court should authorize the prisoner to file the entire application in the district court, even if some of the claims in the application do not satisfy the applicable standards." *United States v. Winestock*, 340 F.3d 200, 205 (4th Cir. 2003).[2] Then, once the application is submitted to the district court, "that court must examine each claim and dismiss those that are barred under § 2244(b) or § 2255 ¶ 8." *Id.* Here, Rendelman included both his preclusion-of-defense claim and his jury instruction claim in his original application to the Fourth Circuit. (ECF No. 165-2 at 6.) Both parties agree that the Fourth Circuit then authorized the application on instructional error grounds, at the very least. (*See* ECF Nos. 175 at 14; 181 at 21.) Even if the Court assumes that the Fourth Circuit did not reach the preclusion-of-defense claim, the Court still "must examine" this claim because the overall application has been authorized. *Winestock*, 340 F.3d at 205.

Because the Fourth Circuit determined only that Rendelman made a *prima facie* showing that he satisfied the requirements of § 2244(b), the Court now examines whether his claims "actually 'satisf[y] the requirements of' § 2244(b)." *In re Stevens*, 956 F.3d 229, 233 n.2 (4th Cir. 2020) (quoting 28 U.S.C. § 2244(b)(4)). Under § 2244(b)(2)(A), Rendelman must show that each of his claims "relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." He has met these requirements for both claims.

*Counterman* established a new rule of constitutional law. "A 'case announces a new rule

---

[2] In 2008, 28 U.S.C. § 2255 ¶ 8 was renamed 28 U.S.C. § 2255(h). The substance of the statute did not change. Pub. L. No. 110-177, 121 Stat. 2545 (2008).

if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.'" *In re Thomas*, 988 F.3d 783, 788 (4th Cir. 2021) (quoting *Teague v. Lane*, 489 U.S. 288, 301 (1989)). "A rule is 'dictated by precedent' if it 'was apparent to all reasonable jurists.'" *Id.* (quoting *Lambrix v. Singletary*, 520 U.S. 518, 527–28 (1997)).

*Counterman* did not change the meaning of what a "true threat" is. That is still measured by an objective standard. *United States v. Garnes*, 102 F.4th 628, 637 (2d Cir. 2024) ("The existence of a true threat depends on what the statement conveys to the person to whom it is directed, rather than on the mental state of the speaker.") What *Counterman* changed is how criminal prosecutions of true threats must be proven. In order to avoid a "chilling effect" on free speech, *Counterman* held that the government must prove that the defendant possessed at least a reckless *mens rea* when making the threat. *Id.* Thus, in a true threat prosecution, the government must prove (1) "that the statements . . . made would, objectively, convey to the listener that the threatening language represented a genuine threat," and (2) "that in making his statements, [the defendant] 'consciously disregarded a substantial risk that his communications would be viewed as threatening violence.'" *Id.* (quoting *Counterman*, 600 U.S. at 69).

As the Supreme Court noted in *Counterman*, lower courts were divided on this precise issue of whether an additional mental state element was required. 600 U.S. at 72. And two Justices dissented from the Supreme Court's holding in *Counterman*. Thus, *Counterman*'s rule was not "dictated by precedent." Accordingly, *Counterman* announced a new rule of constitutional law. *Accord Butler v. McKellar*, 494 U.S. 407, 415 (1990).

This new rule applies retroactively to cases on collateral review. New substantive rules apply retroactively while new procedural rules do not. *Thomas*, 988 F.3d at 789. A rule is substantive if it "alters the range of conduct or the class of persons that the law punishes." *Schriro*

*v. Summerlin*, 542 U.S. 348, 353 (2004). *Counterman*'s rule meets this definition. Before *Counterman*, a defendant could be prosecuted even if he had no subjective intent to threaten, as long as a reasonable person would construe his words as threats. Now, *Counterman* has "placed that individual and others like him beyond the government's power to prosecute." *Thomas*, 988 F.3d at 789. Thus, *Counterman*'s new rule is substantive and applies retroactively on collateral review.

Finally, this new rule was previously unavailable to Rendelman. "To satisfy this requirement, the new constitutional rule [Rendelman] puts forth must not have been available to him when he brought his last federal proceeding—including an authorization motion—challenging his conviction." *Id.* at 790. Rendelman's last federal proceeding challenging his conviction concluded in September 2015. (ECF No. 125.) *Counterman* was decided in June 2023. Rendelman satisfies this last requirement.

All that is left before the Court can reach the merits is to determine if Rendelman's claims "rel[y] on" *Counterman*. *See* 28 U.S.C. § 2244(b)(2)(A). The Fourth Circuit has interpreted the "relies on" language in § 2244(b)(2)(A) broadly. It has explained that a claim for post-conviction relief need only rely "in part" on the new rule of constitutional law. *United States v. Winston*, 850 F.3d 677, 682 (4th Cir. 2017), *overruled on other grounds by*, *United States v. White*, 987 F.3d 340, 343 (4th Cir. 2021). Furthermore, "when an inmate's sentence *may* have been predicated on application" of the old rule, "the inmate has shown that he 'relies on' a new rule of constitutional law within the meaning of 28 U.S.C. § 2244(b)(2)(A)." *Id.* (emphasis added).

Both of Rendelman's claims "rely on" *Counterman*. As to the jury instruction claim, at trial, the government cited several pre-*Counterman* cases which held that only the objective element was required. (ECF No. 77 at 25.) The trial judge then concluded that this was the correct

11

standard and found that the government did not need to prove Rendelman's subjective mental state. (*Id.* at 26.) Rendelman now claims, and the government does not dispute, that this instruction was error because *Counterman* requires a subjective element. Thus, Rendelman's jury instruction claim relies on *Counterman*'s new rule.

Rendelman's preclusion-of-defense claim likewise relies on *Counterman*. Rendelman claims that he was prohibited from offering critical testimony going to his state of mind and explaining "why he did what he did." (ECF No. 175 at 20.) He claims that this occurred because "the trial court repeatedly ruled that Mr. Rendelman's subjective intent was irrelevant because (under then-applicable law) the government needed to prove only that a reasonable person would find Mr. Rendelman's letters threatening." (ECF No. 190 at 7.) The record is replete with these rulings. (*E.g.*, ECF Nos. 67 at 42; 76 at 37; 77 at 26.) Even if the trial court was not always explicit in its rationale for its rulings, the context is clear that these rulings were based at least "in part" on the pre-*Counterman* rule. The Court "will not penalize [Rendelman] for a court's discretionary choice not to specify" the precise basis for its rulings when that basis is clear from the record as a whole. *Winston*, 850 F.3d at 682. Accordingly, the Court concludes that Rendelman's preclusion-of-defense claim "relies on" the new rule announced in *Counterman*.

## B. *Counterman* Errors Committed at Trial

Satisfied that Rendelman has met the strict procedural and jurisdictional requirements of §§ 2244 and 2255, the Court now turns to the merits of his claims.

### 1. Jury Instructions

Rendelman argues that the "trial court's failure to instruct the jury on the *mens rea* element of the true-threat offense violated [his] constitutional right to have a jury find that element beyond a reasonable doubt." (ECF No. 175 at 20.) He points to Supreme Court caselaw, which explains

12

that a jury instruction which relieves the government of proving beyond a reasonable doubt "the critical question of [a defendant's] state of mind" is "constitutional error." (*Id.* (citing *Sandstrom v. Montana*, 442 U.S. 510, 520–21 (1979)).) The government does not contest that the instruction was erroneous. (*See* ECF No. 181 at 15.).

The Court agrees that the jury instruction was erroneous. And it was an "error of constitutional magnitude" for two reasons. *See Dixon*, 2024 WL 415348, at *3. First, under the Fifth Amendment, the government must prove each and every element of the offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). But at his trial, the jury was not instructed to consider whether Rendelman possessed the subjective intent to threaten, a necessary element of a § 876(c) offense after *Counterman*. (ECF No. 98 at 24–25.) Thus, Rendelman's Fifth Amendment right was violated. Second, this error was a violation of the First Amendment. The First Amendment "demand[s] a subjective mental-state requirement shielding some true threats from liability" to avoid a "chilling effect" on free speech. *Counterman*, 600 U.S. at 75. Thus, when a defendant in a true-threats case is "prosecuted in accordance with an objective standard, . . . that is a violation of the First Amendment." *Id.* at 82. Here, the jury instructions stated only an objective standard. (ECF No. 98 at 24-25.) That error violated the First Amendment.

### 2. Preclusion of Defense

Rendelman next asserts that the trial court committed a second error because it did not allow him to present a defense that explained his subjective state of mind. Rendelman hoped to present a two-part defense. Initially, he wanted to introduce psychological reports and other evidence showing that he was nonviolent. (ECF Nos. 77 at 59–60; 76 at 36–37.) He claimed that the recipients of his letters—who testified for the government—had seen these reports and knew he was nonviolent. (ECF Nos. 77 at 59–60; 76 at 36–37.) Then, Rendelman planned to testify

that he did not view his communications as threatening because he thought the recipients knew he was nonviolent. (*See* ECF No. 77 at 59.) Rather, he merely intended his letters as a protest against his perceived harsh treatment in prison. (*Id.* at 25.)

The government argues that this preclusion-of-defense claim is forfeited because Rendelman did not sufficiently raise it at trial. The government points out that in ruling on Rendelman's first habeas petition in 2013, the Court held—in the context of an ineffective assistance of appellate counsel claim—that Rendelman had failed to offer the psychological reports into evidence. (ECF No. 114 at 13.)

Although the issue is close, the Court now concludes that Rendelman did enough to preserve his preclusion-of-defense claim. The Court emphasizes two points. First, Rendelman's claim of error is *not* that evidence was improperly excluded. Rather, it is that he was unconstitutionally prevented from raising a state of mind defense at all. (ECF No. 175 at 11–12.) Thus, while the parties debate the applicability of Rule 103(a)(2), Federal Rules of Evidence, to the issue, the proper inquiry is under Rule 51(b), Federal Rules of Criminal Procedure. *See Greer v. United States*, 593 U.S. 503, 507 (2021) ("Here, both defendants forfeited their *mens rea* claims by failing to properly preserve them under Rule 51(b)."). Rule 51(b) states:

> A party may preserve a claim of error by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection. If a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party. A ruling or order that admits or excludes evidence is governed by Federal Rule of Evidence 103.

Fed. R. Crim. P. 51(b). Critically, this Rule is not "formulaic" and "does not require a litigant to complain about a judicial choice after it has been made." *United States v. Lynn*, 592 F.3d 572, 578 (4th Cir. 2010) (internal quotation marks and citation omitted).

14

Second, the Court emphasizes that *pro se* litigants, such as Rendelman, are entitled to significant leeway in how they press their legal arguments. *See, e.g., Stratton v. Mecklenburg Cnty. Dep't of Soc. Servs.*, 521 F. App'x 278, 288 (4th Cir. 2013); *United States v. Ottaviano*, 738 F.3d 586, 594 (3d Cir. 2013). While "district judges are not mind readers," *pro se* claims "represent the work of an untutored hand requiring special judicial solicitude." *Stratton*, 521 F. App'x at 290–91 (internal quotation marks omitted) (citation modified).

Here, it requires no "mind-reading" to understand the defense that Rendelman wished to present. Before trial even began, he explicitly asked Judge Titus whether his defense could be that the letters were protests. (ECF No. 77 at 25.) Judge Titus responded: "It is not what is in Mr. Rendelman's mind that is relevant. It's . . . what a reasonable person receiving the communication would believe it to be, and that's how I intend to instruct the jury on the question." (*Id.* at 26.) In the Court's view, this is sufficient to preserve Rendelman's claim that he should have been allowed to present a state of mind defense. At that point, the "judicial choice . . . has been made," and Rendelman—a criminal defendant proceeding *pro se*—had preserved his claim of error. *See Lynn*, 592 F.3d at 578.

Even if that were not enough, Rendelman still sought to raise a state of mind defense on several other occasions only to be prohibited from doing so. For instance, when Rendelman referenced the psychological reports during his opening statement, Judge Titus sustained the prosecution's objection that Rendelman's "mental state is not going to be in evidence whatsoever, and interjecting that into this trial . . . does nothing but confuse the jury." (*Id.* at 59.) Judge Titus instructed Rendelman to move on and said he would conclusively rule on it in the evidentiary phase. (*Id.* at 60.) But he stated that the admissibility of the reports was "doubtful." (*Id.*) Rendelman did not later offer the reports into evidence during the evidentiary phase.

Later, Rendelman cross-examined one of the letter recipients, the state court prosecutor. He sought to ask her if she was aware that his presentence report noted that he had a history of nonviolence. (ECF No. 76 at 36.) The relevance of this line of questioning was to show that Rendelman thought his letter recipients knew he would never act on what he stated in his letters. But, following then-applicable law, Judge Titus prohibited this line of questioning. (*Id.* at 37.) He reiterated that "the case law interpreting this section of Title 18 is what would a reasonable person receiving this communication take it to be, not what you intended it to be and not whether you have some history of sending things and not following up." (*Id.*) After this colloquy, Rendelman did not seek to question witnesses about the presentence report or the psychological evaluations again.

Rendelman also clearly sought to testify about his state of mind but was prohibited from doing so. The Fourth Circuit has explained that, under Rule 51(b), a defendant need not formally object to restrictions on his testimony to preserve a claim that such restrictions were erroneous. *United States v. Woods*, 710 F.3d 195, 200 n.2 (4th Cir. 2013). Rather, a defendant "inform[s] the court of his desired rulings by attempting to testify regarding specific issues, thereby prompting the government's objections." *Id.* This "attempted testimony ... preserve[s] [a defendant's] claim of error." *Id.*

It is true that, unlike in *Woods*, Rendelman never actually took the witness stand, so there was not a formal ruling excluding his testimony. However, under the circumstances of this case, the Court finds that he "attempt[ed] to testify" regarding his state of mind. Rendelman initially said during his opening statement that he intended to testify. (ECF No. 77 at 63–64.) But, as explained above, over the course of the trial, the trial court repeated multiple times that Rendelman's state of mind was irrelevant. (*See, e.g.*, ECF Nos. 76 at 37; 77 at 24–26.) Even so,

16

after the prosecution concluded its case-in-chief, Rendelman still affirmed that he wanted to testify. (ECF No. 67 at 42.) But just before Rendelman's defense case would have begun, the trial court explained once again that a true threat is measured only by an objective standard. The trial court specifically stated that "[i]t could very well be that a person actually didn't perceive something as a threat, but the question is whether the jury believes that a reasonable person did." (ECF No. 67 at 42.) The trial court then emphasized the risks of testifying and stated: "There's no harm by not testifying, and you can do harm to yourself when you testify." (*Id.* at 43.) The trial court also explained that the "vast majority of criminal defendants don't testify" and "[t]here's probably a good reason for that." (*Id.*) A few moments later, Rendelman changed his mind and elected not to testify. (*Id.* at 44.) While Rendelman did not precisely state his reasoning for choosing not to testify, it is clear to the Court that his "attempted testimony" would have been about his subjective state of mind. And having just been warned that such testimony would not be permitted, Rendelman elected to avoid the perils of cross examination because direct examination would have served him little benefit. Accordingly, after a thorough review of the trial record and considering all the relevant circumstances, the Court finds that Rendelman preserved his preclusion-of-defense claim. [3] [4].

---

[3] The Court's reasoning on error preservation when denying Rendelman's first habeas petition does not dictate a contrary result now. (*See* ECF No. 114 at 13.) When Rendelman brought his first habeas petition, he only asserted that the psychological reports should have been admitted. (ECF No. 114 at 3.) The Court determined that he had not sufficiently preserved this issue under Rule 103(a)(2). (*Id.* at 13.) But, as the Court has explained, Rendelman's claim now is meaningfully different. He argues that his entire state of mind defense—which includes his opening statement, the psychological reports, the presentence report, and critically, his own testimony—was precluded. (ECF No. 175 at 11–12.) That claim was not brought in 2012, nor could it have been pre-*Counterman*. And as explained above, as a whole, he has done enough to preserve this claim even if a constituent part (namely, exclusion of the psychological reports), if raised in isolation, may not have been properly preserved.

[4] Rendelman also argues that, even if he did not properly preserve his preclusion-of-defense claim, there is cause and prejudice for the procedural default. (ECF No. 190 at 19.) Cause may exist when the Supreme Court reverses "a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved." *Reed v. Ross*, 468 U.S. 1, 17 (1984) (internal quotations marks omitted). However, this is a very difficult standard to meet. *See Engle v. Isaac*, 456 U.S. 107, 130 (1982) (explaining in a § 2254 case that "the futility of presenting an objection to the state courts cannot alone constitute cause for a failure to object at trial"). In any event, the Court need not determine if there was cause and prejudice because there was no

The Court now must address whether the preclusion of Rendelman's defense was a constitutional error. Rendelman bases his claim of constitutional error on the Supreme Court's line of cases recognizing the constitutional right of criminal defendants to establish a defense. *E.g.* *Washington v. Texas*, 388 U.S. 14, 19 (1967); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). There does not seem to be Fourth Circuit precedent on how this line of cases applies when critical evidence of a defendant's state of mind has been excluded. Recognizing this, Rendelman relies heavily on the Ninth Circuit's decision in *DePetris v. Kuykendall*, 239 F.3d 1057 (9th Cir. 2001) to buttress his argument. In *DePetris*, a defendant on trial for killing her abusive husband sought to testify that she subjectively believed she was in danger. *Id.* at 1060–61. Under California law, if the jury made a finding of subjective belief of danger, then it was required to find the defendant guilty only of voluntary manslaughter, not murder. *Id.* at 1059. At trial, there was significant testimony from the defendant's friends and family about the abuse she had suffered. *Id.* at 1060. An expert psychologist also testified that the defendant suffered from Battered Woman's Syndrome. *Id.* Thus, there was significant circumstantial evidence that the defendant may have subjectively believed that she was in danger. However, the trial judge did not allow the defendant to admit her husband's journal—which contained graphic accounts of how he had abused other people—or testify as to how her reading of the journal affected her. *Id.* at 1060–61.

Despite the substantial evidence that the defendant did present, the Ninth Circuit—on highly deferential 28 U.S.C. § 2254 review, no less—found that the defendant's "clearly established right to . . . present a valid defense as established by the Supreme Court

---

procedural default.

in *Chambers* and *Washington*" was violated. *Id.* at 1063. The Ninth Circuit reasoned that this was a "case where proof of the defendant's state of mind was an essential element of the defense." *Id.* at 1062–63. Thus, there was "simply no denying that the most important witness in the defense of [the defendant] was [the defendant] herself." *Id.* at 1062. However, the trial court had precluded the defendant's testimony about the fear she felt after reading the journal and excluded admission of the journal itself, which would have corroborated her testimony. *Id.* at 1063. This "prevented [the defendant] from testifying fully in her own behalf about why she did what she did." *Id.* at 1062. As a result, the defendant's constitutional right to present a defense was violated.

The Court is persuaded by the rationale of *DePetris*.[5] Here, too, is a case where state of mind is an essential element of the defense. In fact, Rendelman conceded to the jury that he committed all elements of the § 876(c) offenses charged, aside from actually making true threats. (ECF No. 68 at 33.) And, after *Counterman*, whether he can be convicted for making true threats depends on his subjective intent. But Rendelman was precluded both from testifying to his subjective mental state and from offering evidence which arguably would have corroborated his testimony by showing that he was not dangerous and only wrote his letters as responses to abuse in prison. As in *DePetris*, the most important witness in Rendelman's defense was Rendelman himself. That is especially so here because, unlike the defendant in *DePetris*, Rendelman offered no other witnesses or evidence in his defense. Therefore, the Court finds that the preclusion of

---

[5] The Court notes that the government did not respond to the merits of Rendelman's preclusion-of-defense claim. The government did not dispute Rendelman's reliance on *DePetris* or explain why the *Chambers/Washington* line of cases should not apply. Instead, the government focused solely on its procedural objection that Rendelman had forfeited this claim. (ECF No. 181 at 20–21.) The Court rejects that argument, as explained above. The Court views the government's acquiescence to Rendelman's argument as a strong indicator that the preclusion of Rendelman's defense was a constitutional error. *Cf. Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." (cleaned up)); *United States v. Pole*, No. CR 09-354 (EGS), 2021 WL 5796518, at *6 (D.D.C. Dec. 7, 2021) (concluding in a post-conviction case that "the government has forfeited its forfeiture argument by not raising it in its opposition" brief).

Rendelman's state of mind defense violated his constitutional right to present a defense.

Moreover, even if Rendelman's constitutional right to present a defense was not violated, there was still constitutional error because the wholesale exclusion of evidence going to Rendelman's state of mind violated his First Amendment right. *Counterman* itself is directly on point. The issue in *Counterman* was not limited to error in the jury instructions. As the Colorado Court of Appeals emphasized on remand, the defendant was also "prohibited from introducing any evidence or making any argument related to his subjective intent." *People v. Counterman*, No. 17CA1465, 2024 WL 3783589, at *2 (Colo. App. June 13, 2024). Indeed, the Supreme Court's majority opinion in *Counterman* never once mentioned jury instructions. Instead, the issue was that the defendant "was prosecuted in accordance with an objective standard." *Counterman,* 600 U.S. at 82. And as noted above, it was this prosecution as a whole "that [was] a violation of the First Amendment." *Id.* Similarly, here, Rendelman was unable to present evidence or testimony about his state of mind because it was deemed irrelevant. But his state of mind was only irrelevant because the trial court was bound by now-invalid precedent. Thus, the preclusion of evidence and testimony going to Rendelman's state of mind was constitutional error because it violated his First Amendment right.

### C. The Errors Were Not Harmless

The Court now considers whether these errors were harmless. On collateral review, harmlessness is determined by a more demanding standard than it is on direct review. In *Brecht v. Abrahamson*, the Supreme Court announced that the standard "is whether the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Although *Brecht* was a § 2254 case that dealt with a state court conviction, the Fourth Circuit has extended *Brecht*'s rule to

motions challenging federal convictions under § 2255. *United States v. Smith*, 723 F.3d 510, 517 (4th Cir. 2013). The *Brecht* standard "requires the habeas petitioner to show that 'there is more than a reasonable possibility that the error was harmful.'" *United States v. Said*, 26 F.4th 653, 660 (4th Cir. 2022) (quoting *Davis v. Ayala*, 576 U.S. 257, 268 (2015)) (cleaned up). To make this showing, the defendant must show that they were "actually prejudiced by the error." *Davis*, 576 U.S. at 267. Mere speculation of prejudice does not suffice. *Id.* at 268. But if a district court "in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted). The *Brecht* standard is also not as rigorous as sufficiency of the evidence review. As the Supreme Court has explained, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* at 438 (citation modified). Finally, when a defendant suffers multiple constitutional errors at trial, the Court may consider their cumulative effect to determine if they had a substantial and injurious effect on the verdict. *Fisher v. Angelone*, 163 F.3d 835, 852 n.9 (4th Cir. 1998) (explaining that habeas courts can consider the cumulative effect of multiple constitutional errors committed at trial when determining harmlessness).

As the government notes, Rendelman has a steep hill to climb. (ECF No. 181 at 15.) *Brecht* imposes an exacting standard upon him. Meanwhile, *Counterman* only imposes a modest burden on the government—to prove a *mens rea* of recklessness, not more. However, after a close examination of the record, the Court finds that the cumulative effect of the errors was not harmless.

At the outset, the Court notes that no other court has yet evaluated a *Counterman* error

under *Brecht*'s "substantial and injurious effect" standard.  However, courts have used other standards to assess whether *Counterman* was satisfied, and they have come to varying conclusions. At one end of the spectrum, several courts have determined, under highly deferential sufficiency of the evidence review, that the government proved a reckless *mens rea*. For instance, the Sixth Circuit found that a defendant's statement, 'I hope you fucking die slowly, very soon' could "constitute a reckless disregard that others could view his statements as threatening violence in the eyes of a rational juror." *United States v. Dodson*, No. 22-3998, 2024 WL 712494, at *6 (6th Cir. Feb. 21, 2024). This was true despite an unchallenged *Counterman* error in the jury instructions. *Id.* at *6. The Sixth Circuit relied heavily on the fact that the defendant's threats were made against a former romantic partner who had shared information about the defendant's criminal activities with the government. *Id.* at *7. The Eleventh Circuit also recently addressed a case in which the defendant called a Congressperson's office and stated that he was "going to put a bomb in [her] office." *United States v. Albizar Martinez*, No. 25-11781, 2025 WL 2814881, at *6 (11th Cir. Oct. 3, 2025). He then said "it's a threat. It's a threat." *Id.* Based primarily off the language of the threat alone, the court found there to be sufficient evidence of a culpable *mens rea*. *Id.* In this case, the jury was properly instructed under *Counterman*. *Id.* Notably, neither of these defendants testified or put on a defense case. *Id.* at *2; *Dodson*, 2024 WL 712494, at *3.

Meanwhile, at the other end of the spectrum, several courts have ordered new trials after determining that the prosecution could not prove that a *Counterman* error was harmless beyond a reasonable doubt. For instance, in *State v. Hensley*, No. 57518-3-II, 2024 WL 800338, at *1 (Wash. Ct. App. Feb. 27, 2024), the defendant stated: "[R]ight now, there is a legitimate death threat that I have made to assassinate [a specific judge] in Clark County of the Washington State Superior Court. I don't want to do that. But I'm willing to do that." However, the defendant

22

testified that he had Tourette's Syndrome. *Id.* at \*2. He stated that he was trying to get arrested so that he could get psychiatric treatment. *Id.* On appeal, the Washington intermediate appellate court found that a *Counterman* error in the jury instructions was not harmless beyond a reasonable doubt because "there was conflicting evidence about whether [the defendant] acted recklessly." *Id.* at \*7. The court specifically noted that the conflicting evidence came from the "testimony about [the defendant's] state of mind." *Id.* In *Commonwealth v. Ostiguy*, No. 23-P-277, 2025 WL 655064 (Mass. App. Ct. Feb. 28, 2025), the Massachusetts intermediate appellate court ruled similarly. There, the defendant made several purported threats including: "You've been warned. Biological warfare is nothing. It is easy, in my book. . . . My life is counterterrorism training." *Id.* at \*1. The court ruled that a *Counterman* error in the jury instructions was not harmless beyond a reasonable doubt because the "defendant's mental state was a live issue at trial." *Id.* at \*2.

In light of this persuasive precedent, several considerations lead the Court to conclude that Rendelman has met his burden under *Brecht*. First, although *Brecht* is a stringent standard, it is not as strict as the sufficiency of the evidence standard that the defendants in *Dodson* and *Albizar Martinez* faced and failed to meet. As the Supreme Court reiterated in *O'Neal*, the question is, even assuming sufficient evidence, "whether the error itself had substantial influence" on the jury's verdict. *O'Neal*, 513 U.S. at 438.

Second, the government evidence addressing Rendelman's subjective state of mind was slight. The prosecution focused direct examinations of its witnesses on their reactions to receiving Rendelman's letters. (*See, e.g.*, ECF Nos. 77 at 91, 93, 107; 76 at 87–88, 103.) For instance, one witness described the safety measures he and his family took after receiving letters from Rendelman. (ECF No. 76 at 87–88.) Another witness was asked about her "personal reaction" to the letters, and she stated that she found them "threatening," "absolutely shocking," and "bizarre."

(*Id.* at 103–04.) The government also called several law enforcement witnesses who described how they reacted to Rendelman's letters and what measures they took in response. (*See, e.g.* ECF Nos. 76 at 183–87; 67 at 26.) The prosecution did not call any associates of Rendelman who could testify to his mental state, nor did it call any psychological experts. It is true that, in one letter, Rendelman said he wrote "threatening letters." (ECF No. 77 at 140.)[6] And some testimony also referenced Rendelman's mental state. (*See, e.g.*, ECF No. 76 at 60.) But in the context of the whole trial, there is minimal record evidence of Rendelman's subjective mental state.

Third, the Court considers the parties' arguments to the jury. *See United States v. Jefferson*, 289 F. Supp. 3d 717, 740 (E.D. Va. 2017) ("[I]t is necessary to look at the evidence the government presented at trial, and how the government framed its case in light of the erroneous jury instructions.") The arguments reveal that the central issue was not Rendelman's intent but whether a reasonable person would construe the letters as threats. In its closing and rebuttal arguments, the prosecution heavily emphasized its witnesses' reactions to receiving the letters as a factor to be considered in deciding if a reasonable person would understand the letters to contain threats. (ECF No. 68 at 9, 11, 13, 17, 22, 69.) The prosecution also repeatedly emphasized to the jury that Rendelman's subjective intent was irrelevant. (*Id.* at 20, 24, 63–64.) In language that runs directly contrary to *Counterman*'s holding, the prosecution stated:

> What the government does not have to prove here is whether Scott Rendelman intended to act on these letters and whether he had the ability to carry out these threats, **or even whether he intended them to be a threat for these people. That's not something before you.** All you have to consider is whether they were threatening communications, and we'll talk more about that, but there's a reason for that.

(*Id.* at 20 (emphasis added).) Furthermore, in Rendelman's statements to the jury, he expressly

---

[6] Notably, the letter containing this language was not one of the letters charged in the indictment.

disavowed a state-of-mind defense. (ECF No. 77 at 66; 68 at 43.) He stated: "The defense in this case is not that these letters are protest. . . . The defense in this case is that the protest is a relevant circumstance that the recipient can take into consideration . . . in making a determination of whether or not the statements in the letter are true threats." (ECF No. 68 at 43.) But after *Counterman*, Rendelman's defense *could be* that the letters were protests. The jury would then have to decide whether it found him credible and, if it did, whether he still acted recklessly. The Court places significant weight on the fact that Rendelman was forced to disavow an argument that would now be his primary defense.

Fourth, the Court examines the plain language of the letters. The government recounts the extremely graphic nature of many of the letters and states that "[t]here is just no gray area here" and that the letters entirely "speak for themselves." (ECF No. 181 at 2, 17–18.) To be sure, Rendelman's letters are profane and graphic, and the Court does not minimize that. But while these aspects of the letters may conclusively prove the objective element in a true threat prosecution, they do not alone demonstrate Rendelman's subjective intent. Indeed, *Hensley* and *Ostiguy* also involved similarly graphic letters but the courts there found sufficient gray area to warrant a new trial. As with the letters in *Hensley* and *Ostiguy*, Rendelman's letters have some indicia that he did not have a subjective intent to threaten. For instance, Rendelman's constant ironic refrain of "I'm rehabilitated" could give reason to think that he is genuinely expressing a protest, not consciously disregarding a risk that his letters would be viewed as threatening. (*See* ECF Nos. 181-3; 181-4; 181-6; 181-8.) Moreover, in *Hensley*, the defendant could not have been clearer when he stated, "there is a legitimate death threat." *Hensley*, 2024 WL 800338, at *1. Yet, he was still given a new trial because of a *Counterman* error in the jury instructions. *Id.* at 7. True, in *Albizar Martinez*, the language "it's a threat . . . It's a threat" was sufficient to satisfy

*Counterman*'s requirements. *Albizar Martinez*, 2025 WL 2814881, at \*6. But in that case, there was no *Counterman* error in the jury instructions and the defendant did not attempt to put on evidence about his mental state. *Id.* at \*2, 6.

And that leads the Court to the final—and most important—factor of its analysis. The Court must consider the compounding effect of the preclusion-of-defense error. Even if Rendelman's letters could "speak for themselves," they should never have been considered in isolation in the first place. That is because Rendelman's mental state was not meant to be just a "live issue" at trial. *See Ostiguy*, 2025 WL 655064, at \*2. It was the core element of his desired defense. But he was unconstitutionally precluded from offering any evidence or testimony to support this defense. Although there was a small amount of other evidence going toward Rendelman's state of mind, it was Rendelman's testimony that was especially critical because his state of mind when writing the letters "was uniquely within [his] knowledge." *DePetris*, 239 F.3d at 1063. Whether Rendelman might still be convicted by a properly instructed jury even after presenting a state of mind defense is not the question before the Court. That question is to be answered by a new jury upon retrial. It is the task of this Court to determine if "I, the judge, think that the error[s] substantially influenced the [original] jury's decision[.]" *O'Neal*, 513 U.S. at 436. The Court answers that question in the affirmative.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Rendelman's Motion to Vacate Convictions. A separate Order follows.

DATED this _6_ day of November, 2025.

26

BY THE COURT:

James K. Bredar
United States District Judge